CHERYL LOPEZ ET AL. *v.* ABRAHAM PRICE ET AL.

DALY, C. J., BALDWIN, KING, MURPHY and MELLITZ, Js.

Argued June 6—decided July 17, 1958

*Julius B. Schatz* and *Edward Seltzer,* for the appellants (defendants McDonald et al.).

*Paul B. Groobert,* with whom were *Ronald K. Jacobs* and, on the brief, *George C. Lessner,* for the appellants-appellees (plaintiffs).

*William P. Aspell,* with whom was *George Muir,* for the appellee (named defendant).

DALY, C. J.   This action was brought to recover damages for personal injuries sustained by Cheryl Lopez and Pamela Lopez, minors, and Anna Lopez, their mother and the wife of William Lopez, who is acting as next friend of the minor children and is also joined as a plaintiff in his own right.  The suit was instituted against Dionigi Arrigoni, the owner

of a truck, Arthur C. McDonald, his agent and employee, and the named defendant, in whose car the children and their mother were riding. Dionigi Arrigoni died before the case was tried, and Anne G. Arrigoni and Charles J. Arrigoni, executors under his will, were made parties to the action. The jury returned a verdict for the named defendant, and for the plaintiffs as against the other defendants, hereinafter referred to as the defendants. Appeals were taken by the defendants and by the plaintiffs. The defendants assign as error the denial of their motions to set aside the verdict and for a directed verdict. Their contention that the court erred in denying their motion to set aside the verdict is based upon their claims (1) that the verdict is not supported by the evidence on the issue of liability and (2) that it is excessive.

The plaintiffs offered evidence to prove the following facts: On June 20, 1953, a bright warm day, at about 11:50 a.m. Pamela Lopez, age four, Cheryl Lopez, age six, and their mother, Anna Lopez, were passengers in an automobile owned and operated by Abraham Price. They were going to a picnic at a place south of Middletown. While proceeding in a southerly direction on Main Street Extension in Middletown, Price decided to stop at a "Dairy Queen" on the east side of the road to obtain ice cream for the children. Main Street Extension was a main artery of traffic. Its complete and usable width for traffic was fifty-six feet. Although there was a slight curve going northerly from the Dairy Queen, the road was substantially straight to the south of it. Price's car was equipped with directional signals, and as he approached the entrance to the Dairy Queen he put on his left front flicker to indicate his intended left turn. When he

came abreast of the Dairy Queen, he stopped his car to permit two oncoming northbound cars to pass by. After those cars had passed, he looked to the south again and saw no other vehicles approaching from that direction. He then turned his car to the left at substantially a right angle and, proceeding at a speed of not more than five or ten miles per hour, had almost driven the front wheels of his car into the Dairy Queen driveway when, without prior warning, the right side of his car was smashed into by a ten-wheel Mack dump truck operated in a northerly direction, at a speed of more than thirty-five miles per hour, by McDonald in the course of his employment by the owner of the truck, Dionigi Arrigoni. The noise of the impact was so great that it was heard 1500 feet away. Price's car was struck on the rear quarter of its right side and after the impact went into a spin and came to rest facing in a northwesterly direction. The damage to the car was approximately $1100. The force of the impact was so great that Mrs. Lopez, a front seat passenger, was thrown out of the car onto a curbstone off the highway, where she lay injured and unconscious. The truck continued northerly after the impact and stopped 112 feet north of the point of the collision. McDonald, called as a witness by the plaintiffs, testified that he was very familar with the highway, that when he first saw Price's car it was about 500 feet away, and that before the impact he did not turn the truck to the right or left, but continued straight ahead.

The defendants claim that McDonald was not negligent, that no negligence on his part was a proximate cause of the injuries and damage sustained by the plaintiffs, that if he was negligent the proximate cause of the collision was the negligence of Price,

that Price's negligence superseded McDonald's alleged negligence, and that any act or failure to act on the part of McDonald was merely a condition and not the cause of the collision.

A verdict of a jury prevails unless it is unsupported by the evidence or unless it is so palpably against the evidence as to indicate prejudice, partiality, corruption, confusion or lack of understanding of the issues by the jury. *Harris* v. *Clinton*, 142 Conn. 204, 209, 112 A.2d 885. The jury are the judges of the credibility of witnesses. They decide what weight justly belongs to the evidence. If the verdict to which they have agreed is a conclusion to which twelve honest men acting fairly and intelligently might come, then that verdict is final and cannot be disturbed. The propriety of the court's refusal to set aside the verdict is to be tested by the evidence *most favorable to the plaintiffs*. The concurrence of the judgments of the judge and the jury who saw the witnesses and heard the testimony is a powerful argument for sustaining the action of the trial court. We are to decide only whether there was evidence which the jury could have reasonably credited and from which they could have fairly reached the conclusion they did. In the last analysis, the defendants ask that this court retry the case on the evidence. We do not do this. *Giambartolomei* v. *Rocky DeCarlo & Sons, Inc.*, 143 Conn. 468, 474, 123 A.2d 760. The verdict for the plaintiffs against the defendants was amply supported by the evidence on the issue of liability. The jury could have fairly reached the conclusion that McDonald was negligent and that his negligence was the proximate cause of the collision and the resulting injuries and damage. The court did not err in denying the defendants' motion for a directed verdict and in denying their

motion to set aside the verdict on the issue of liability.

Cheryl, who was six years old, was seated behind the driver, away from the direct force of the impact. The plaintiffs offered evidence to prove the additional following facts: She sustained a contusion of her nose with some abrasions, a contusion of her upper lip, and a loosening of her right upper incisor. She had dizziness and headaches. Although x-rays of her nose were negative for fracture, she continued to complain of difficulty in breathing through her nose. She sustained and was suffering from a deviated septum as a result of the accident. Her back injury was diagnosed as a dorsal strain. At the time of trial she complained of back pain in the middorsal region, sometimes extending down to about the dorsolumbar junction. She will have a small permanent partial disability of her back for the remainder of her life. Her life expectancy, at the time of trial, was 63.77 years.

Mrs. Anna Lopez, who was thrown from the car and rendered unconscious, was taken by ambulance to the Middlesex Memorial Hospital in Middletown, as were the two children. She was transferred to the Manchester Memorial Hospital. She suffered a cerebral concussion, shock, contusion of her anterior chest and abdominal wall, aggravation of a lumbo-sacral strain, extreme post-injury nervousness, and multiple contusions of the body. Her intestines were partially inactivated or paralyzed, causing her stomach to distend. In addition, she received a trauma to her abdomen and probably had some bleeding in, or posterior to, the abdomen. Her abdominal injury was diagnosed as an ileus. She was very tense, anxious, nervous and upset. She remained in the hospital for approximately two

weeks, and was in bed for the first month at home. She has continued under the care of several doctors, including a neurologist. She suffers from backaches and headaches and has been obliged to curtail household and other activities. She has a 10 per cent permanent partial disability of her lower back. Her life expectancy, at the time of trial, was 43.08 years.

The defendants claim that the damages awarded —$75,000 to Pamela, $2000 to Cheryl and $5000 to Mrs. Lopez—were excessive and that, consequently, the court erred in denying the motion to set aside the verdict. They concede that the awards of $2000 to Cheryl and $5000 to Mrs. Lopez, standing by themselves, would not shock the sense of justice, but assert that when they are viewed together with the $75,000 award to Pamela, it becomes apparent that they all fall into the same pattern and that they then so shock the sense of justice as to compel the conclusion that the jury were influenced by partiality, prejudice or mistake. If the damages awarded to Mrs. Lopez and Cheryl are in amounts which do not shock the sense of justice, they are not excessive. The test is whether the amount of each award complained of falls somewhere within the necessarily uncertain limits of just damages or whether the size of the award so shocks the sense of justice as to compel the conclusion that the jury were influenced by partiality, prejudice, mistake or corruption. The refusal of the trial court to disturb a verdict is strong support for its propriety. *Sheiman* v. *Sheiman,* 143 Conn. 222, 224, 121 A.2d 285. The question is one peculiarly within the province of the jury. Juries may differ widely in the conclusions which they reach in apparently similar cases, and, in fact, in any given case one jury might

arrive at a result substantially different from that of another jury. This flexibility, though it may lead to uncertainty, is a necessary concomitant of the jury system as it operates. *Fairbanks* v. *State,* 143 Conn. 653, 661, 124 A.2d 893. The damages awarded to Mrs. Lopez and Cheryl were clearly not excessive in view of the evidence offered as to the nature of their injuries and require no further discussion.

The remaining question is whether the award of $75,000 to Pamela was excessive. She was seated on the right side of the rear seat at the time of the collision and suffered a severe laceration of the right side of her forehead, in the right eyebrow area. Dr. Walter M. Schardt and Dr. Arthur C. Unsworth, ophthalmologists, physicians specializing in the study and treatment of defects and diseases of the eye, testified. A summary of their testimony is the following: The trauma ruptured a blood vessel supplying the optic nerve, causing a hemorrhage, which in turn caused pressure on the nerve. The vision in her right eye was reduced to 20/200, which is considered the ophthalmological equivalent of total loss of vision in that eye. She cannot read fine print or do very fine work such as sewing. If she ever works in a factory, she will not be able to put small parts together. She will not be able to do clerical work. As far as earning capacity is concerned, her right eye is for all practical purposes blind. This impairment is permanent. In addition to 100 per cent loss of vision in the right eye, her ability to use both eyes for depth perception has disappeared. She will not be able to take part in sports like tennis, baseball or handball, where there is a fast moving object. She will have difficulty in judging the position of any fast moving object, such as a moving automobile. She will be handicapped in

driving. She will have a relatively blind side on her right and will tend to bump into things on that side. She now has an intermittent exotropia, a turning out of the right eye, which will become permanent in the future. An eye so affected is commonly referred to as a "walleye." However, the most important residual, regardless of the 100 per cent loss of vision, the lack of depth perception and the walleye, is the fact she is now left with no reserve eye. Safety glasses to protect her good eye were prescribed. She suffered, in addition to the eye injury, a severe contusion of the right side of the face and head which together with the laceration left a scar on the outer aspect of the right eyebrow, a cerebral concussion with multiple contusions and abrasions, and a fracture of the right clavicle.

Pamela's life expectancy, at the time of trial, was 65.64 years. If the award of $75,000 were to be considered as compensation for her eye injury alone, that amount divided by the number of years of her life expectancy would provide only approximately $1150 per year. It is true that because her life expectancy was 65.64 years it cannot be said that she will live that number of years after the date of the trial. She may die sooner or she may live longer. The number of years she may be expected to live was, however, a factor which the jury could properly consider. The defendants cite cases in their brief as authorities for their claim that the award of $75,000 was excessive. "The value of comparison with the amounts of verdicts in other cases, in considering whether a verdict is excessive, is impaired not only by ever-present lack of complete identity of facts and circumstances . . . but also by changes in economic considerations." *White* v. *L. Bernstein & Sons, Inc.,* 123 Conn. 300, 303, 194 A. 723. "The

question of damages in personal injury cases, especially in these times of changing values, is always a difficult one. *Prosser* v. *Richman,* 133 Conn. 253, 256, 50 A.2d 85. Assessment of damages is peculiarly within the province of the jury and their determination should be set aside only when the verdict is plainly excessive and exorbitant. *Szivos* v. *Leonard,* 113 Conn. 522, 525, 155 A. 637; *Rutkowski* v. *Connecticut Light & Power Co.,* 100 Conn. 49, 54, 123 A. 25. Proper compensation for personal injuries cannot be computed by mathematical formula, and the law furnishes no precise rule for their assessment. *Russakoff* v. *Stamford,* 134 Conn. 450, 455, 58 A.2d 517; *Samaha* v. *Mauro,* 104 Conn. 300, 302, 132 A. 455; *Knight* v. *Continental Automobile Mfg. Co.,* 82 Conn. 291, 293, 73 A. 751. The only practical test to apply to a verdict is whether the award of damages falls somewhere within the necessarily uncertain limits of fair and reasonable compensation in the particular case, or whether the verdict so shocks the sense of justice as to compel the conclusion that the jury were influenced by partiality, prejudice, mistake or corruption." *Slabinski* v. *Dix,* 138 Conn. 625, 629, 88 A.2d 115. In the light of this test, the jury could reasonably have returned the verdict awarding the plaintiff Pamela Lopez $75,000. Consequently, we cannot say that the amount of the award to her was excessive.

The plaintiffs appealed from the judgment and assigned as error the court's denial of (1) their motion for judgment notwithstanding the verdict and (2) their motion to set aside the verdict rendered in favor of the defendant Price. They stated, however, that they would not press their appeal if no error was found on the appeal of the defendants McDonald and Arrigoni. This amounts to a con-

ditional withdrawal of the plaintiffs' appeal. The condition has been fulfilled since no error has been found on the other appeal. The judgment of this court should therefore state that the plaintiffs' appeal has been withdrawn. *Carlino* v. *Meriden,* 132 Conn. 394, 396, 44 A.2d 823.

There is no error on the appeal of the defendant Arthur C. McDonald and the defendants Anne G. Arrigoni and Charles J. Arrigoni, executors under the will of Dionigi Arrigoni; the plaintiffs' appeal has been withdrawn.

In this opinion the other judges concurred.