## STATE OF CONNECTICUT *v.* JAMES GRIFFITHS

KING, C. J., MURPHY, ALCORN, COMLEY and HOUSE, Js.

Argued June 4—decided July 14, 1964

*Charles L. Flynn,* for the appellant (defendant).

*Francis J. MacGregor,* assistant attorney general, with whom were *Ernest H. Halstedt,* assistant attorney general, and, on the brief, *Harold M. Mulvey,* attorney general, and *Richard E. Rapuano,* assistant attorney general, for the appellee (state).

ALCORN, J. The state welfare commissioner, acting through his authorized deputy, brought a verified petition under § 17-324 of the General Statutes as amended by Public Acts 1959, No. 42, § 1 for an order by the Court of Common Pleas directing the defendant to contribute under the state's aid to dependent children, hereafter called A.D.C., program. The petition alleges that Mary, Charles and Christopher McGilton are beneficiaries of public assistance under the A.D.C. program in a monthly sum, a portion of which is specifically allotted to the needs of Mary; that the defendant is Mary's father;

that pursuant to General Statutes § 17-90 the defendant has been found responsible for the contribution of a monthly amount beginning June 1, 1962; and that he is able to make a contribution but has refused to pay anything. The petition seeks a court order for such support as the court finds to be reasonably commensurate with the defendant's financial ability. The defendant denied the allegations of the petition and filed a special defense in which he alleges that Mary's children are the issue of a bigamous marriage; that she applied for A.D.C. assistance prior to April 9, 1962, and the defendant objected to her receiving public aid but expressed a willingness to care for Mary and her children in his own home where he lives with his wife and three children; that by reason of this offer of a home and support, Mary is not eligible for aid under § 17-90;[1]

[1] "Sec. 17-90. INVESTIGATIONS. GRANT OF AID. CONTRIBUTION BY RELATIVES. The commissioner, upon receipt of an application for aid, shall promptly and with due diligence make an investigation, such investigation to be completed within sixty days after receipt of the application. The commissioner shall investigate the financial condition of each applicant's and recipient's husband, wife, father, mother and child or children. The commissioner shall grant aid only if he finds the applicant eligible therefor, in which case he shall grant aid in such amount, determined in accordance with standards established by the commissioner, as is needed in order to enable the relative to support such dependent child or children and himself in health and decency .... The commissioner shall make a determination as to the financial ability of each relative referred to herein to contribute to the applicant's or recipient's support in accordance with a reasonable contribution scale established by said commissioner, and shall notify in writing each of such relatives of the amount each is found able to contribute toward such support, and each such relative shall be liable in said amount from the date of such notice, unless and until such support responsibility shall be otherwise fixed by a court of competent jurisdiction. . . . Such relative shall have the right to a fair hearing as to any such determination, in accordance with the provisions of sections 17-2a and 17-2b. If an application for an award is not acted upon within ninety days after the filing of the application, the applicant may

51

that he was notified in June of the welfare commissioner's determination of his ability to contribute under § 17-90 but was not advised of his right to appeal under §§ 17-2a and 17-2b;[2] that § 17-90 is unconstitutional because it is an unlawful delegation of legislative power, permits a taking of the defendant's property without due process of law, and denies the defendant the equal protection of the law; and that the state is underwriting an immoral activity and requiring the defendant to subsidize it in the guise of welfare. In his reply, the welfare

apply to the commissioner for a hearing in accordance with said sections 17-2a and 17-2b and the commissioner or any person authorized by him shall hold a fair hearing promptly."

[2] "Sec. 17-2a. FAIR HEARINGS BY COMMISSIONER. APPLICATION. SUBPOENAS. An aggrieved person authorized by law to request a fair hearing on a decision of the welfare commissioner, or the conservator of any such person on his behalf, may make application for such hearing in writing over his signature to the commissioner and shall state in such application in simple language the reasons why he claims to be aggrieved. Such application shall be mailed to the commissioner within thirty days after the rendition of such decision. The commissioner shall thereupon hold a fair hearing within thirty days from receipt thereof and shall, at least ten days prior to the date of such hearing, mail a notice, giving the time and place thereof, to such aggrieved person. A reasonable period of continuance may be granted for good cause. . . .

"Sec. 17-2b. DECISION. APPEAL. (a) Not later than thirty days after such hearing, the commissioner or his designated hearing officer shall render a final decision based upon all the evidence introduced before him and applying all pertinent provisions of law, regulations and departmental policy, and such final decision shall supersede the decision made without a hearing. Notice of such final decision shall be given to the aggrieved person by mailing him a copy thereof within seventy-two hours of its rendition. Such decision after hearing shall be final except that the applicant for such hearing, if aggrieved, may appeal therefrom, within thirty days from the date of its rendition, to the court of common pleas for the county wherein he resides, in accordance with the provisions of subsection (b) of this section. No appeal may be taken from a decision made without a hearing. . . ." (Section 17-2b was amended by Public Acts 1963, No. 73, § 1 in a manner immaterial to this case.)

commissioner put the defendant to the proof of his allegation that Mary was not eligible for support because of the defendant's offer to provide for her and her children in his home, his allegation of lack of warning of his appeal rights under §§ 17-2a and 17-2b, and his allegations as to the unconstitutionality of § 17-90 and the state's effort to compel him to subsidize immoral activity in the guise of welfare.

On this state of the pleadings, the defendant assumed the burden of proof of the contested issues raised by his special defense. The state was required to prove only that the persons identified in the petition were the beneficiaries of the A.D.C. program and that the defendant, as Mary's father, is able, but has refused, to make a contribution toward that support in an amount which had been determined, and of which he had been notified, under § 17-90. All other issues were injected by the defendant's special defense. The fact that Mary and her children were receiving A.D.C. payments is not disputed, and the defendant does not contest his financial ability to pay the requested contribution. The trial therefore focused primarily on the issues pleaded in avoidance in the special defense.

The facts found by the court and the factual conclusions based thereon stand unattacked because the defendant's brief ignores all assignments of error directed at the finding. *State* v. *Ferraiuolo,* 145 Conn. 458, 459, 144 A.2d 41. The finding discloses the following. Mary McGilton contracted a bigamous marriage with Charles McGilton. Her children, Charles and Christopher, are a result of that marriage and are illegitimate. Mary is the defendant's daughter. The defendant lives with his present wife, who is not Mary's mother, and their

three children. Mary lives with her mother, now known as Mrs. Pruneau, who is separated from her present husband. Mary first applied for public assistance on June 27, 1960, when she had one child and while Charles McGilton, the father of the child, was in Cheshire Reformatory. The state investigated Mary's eligibility for A.D.C. and the responsibility of her legally liable relatives under § 17-90 and granted assistance to Mary in August, 1960. Charles was released from the reformatory in March, 1961, and the aid to Mary was discontinued. In May, 1961, Mary reapplied for assistance, Charles having been recommitted to the reformatory. Mary stated her only source of income to be the West Haven welfare department. The state reinvestigated her eligibility and granted aid effective July 1, 1961. Thereupon, a representative of the state communicated with the defendant, who offered to take Mary and her child into his home and provide for them there because he did not want them to receive A.D.C. Mary was then expecting another child, but the defendant has remained willing to care for her and her children at his home. Mary, who is over twenty-one and now has three children, refuses to live with her father. In March, 1962, Charles McGilton was released from confinement and went to live with his mother. On investigation by the state, he was found to have worked one day in May, 1962. In December, 1962, he was back in jail where he has been, on and off, since 1960. He was not compelled to pay any support for Mary or her children between March 15, 1962, and May 31, 1963. Conferences concerning the defendant's contribution for Mary's support, but not for the support of her illegitimate children, were held in April, 1962, but the defendant refused

to contribute. In May, 1962, he was notified by letter that he had been found to be a legally liable relative and, pursuant to § 17-90, able to contribute a monthly amount for Mary's support beginning June 1, 1962. The back of the letter contained a notice of the right to a hearing under the statute.

The court concluded that the state made the required investigation of Mary's application and, since May 1, 1962, has granted A.D.C. assistance to her, a specific part of which is allocated to her individual support; that the state notified the defendant on May 2, 1962, of its determination of the amount which he, as Mary's father, is able to contribute to her support; that, although he had an opportunity to do so, the defendant did not apply for a hearing before the welfare commissioner on that determination; that, although the defendant is willing to care for Mary and her children in his home, she cannot be compelled to live with him; and that the defendant has failed to prove the unconstitutionality of the statute involved. The court accordingly found the issues for the state and rendered judgment for support.

The unattacked factual determinations made by the court leave, as the only issues requiring extended discussion, the questions whether § 17-90 is unconstitutional as an illegal delegation of power to the welfare commissioner and whether it operates to deprive the defendant of due process and equal protection of the law. The generality of the defendant's claims relating to due process and equal protection renders a precise discussion of any clearly defined claim of infringement of his rights impossible.

Three rulings on evidence which are assigned as error are based on the claim that the burden rested

on the state to offer evidence of Mary's eligibility for welfare aid before the evidence to which objection was made could be admitted. Since, on the pleadings, the defendant assumed the burden of proving her ineligible for aid, the basis of the objections disappears.

The claim that Mary is ineligible for aid merely because of her refusal to live with the defendant is without merit. The imposition of a statutory obligation to support an adult does not empower the person so obligated to determine the place where that support shall be furnished. *Condon* v. *Pomroy-Grace,* 73 Conn. 607, 611, 48 A. 756; see also *Backus* v. *Dudley,* 3 Conn. 568, 573. The record in this case leaves wholly to conjecture the reasons for Mary's refusal to live with the defendant and the suitability of the defendant's home or its adequacy as compared to the quarters now occupied by Mary and her children.

Statutes making relatives of designated degree liable for the support of another adult have generally survived a variety of attacks, including those on constitutional grounds. *Meredith* v. *Ray,* 292 Ky. 326, 166 S.W.2d 437; see cases collected in a note in 48 A.L.R. 733. Other cases are collected in a note in 1 A.L.R.2d 910, 935-46; see also 41 Am. Jur., Poor and Poor Laws, §§ 6-8; 67 C.J.S., Parent and Child, §§ 17, 24; 44 C.J.S., Insane Persons, §§ 73-75; 70 C.J.S., Paupers, § 60. In line with this general principle, considerable significance attaches to the fact that the Connecticut statutes, such as §§ 17-295, 17-298 and 17-305 (providing contribution from designated relatives of patients in humane institutions), § 17-320 (providing support from designated relatives of persons unable to support themselves), and § 17-324, under which the petition in

this case was brought, have, over the years, been applied free of any attack as to their validity on constitutional grounds. Statutes imposing liability for the support of adult blood relatives and decisions enforcing and interpreting them are older than the United States. The progenitor of the so-called poor laws is the English statute 43 Elizabeth, chapter 2, § 7 (1601), which is quoted in part in *Mack* v. *Parsons,* 1 Kirby 155, 156. Among our own statutes, the one which has received the most frequent interpretation is the one which is now § 17-320, the progenitor of which appeared in 1715. Statutes 1702-1733, p. 204; see *Condon* v. *Pomroy-Grace,* supra; *Koniak* v. *Koniak,* 123 Conn. 338, 340, 195 A. 189. The defendant seems to claim that the lack of any provision in § 17-90 for notice to him of Mary's initial application for A.D.C. and the opportunity for a hearing prior to action thereon by the commissioner is a deprivation of due process. See *Beach* v. *District of Columbia,* 320 F.2d 790, 794 (D.C. Cir.), cert. denied, 375 U.S. 943, 84 S. Ct. 351, 11 L. Ed. 2d 274; *State* v. *Bateman,* 110 Kan. 546, 548, 204 P. 682. The defendant is not materially affected by § 17-90, however, until the commissioner has determined that the defendant, as a legally liable relative, is able and required to contribute to his daughter's support. The determination of the commissioner as to the liability of the defendant and his ability to pay necessarily involved a determination that Mary was eligible for aid and was entitled to receive it in the amount granted. The defendant, under §§ 17-2a and 17-2b, was given the right to a hearing on that question as well as a subsequent appeal to the court from an adverse decision thereon.

The defendant's failure to take advantage of the

hearing and appeal provided for in §§ 17-2a and 17-2b precludes him from raising, on this appeal, issues which could, and should, have been raised in a hearing before the commissioner. *Country Lands, Inc.* v. *Swinnerton,* 151 Conn. 27, 33, 193 A.2d 483, and cases cited. The procedure defined, including, as it does, notice, representation by counsel, transcript, testimony under oath, subpoena power, immunity of witnesses and appeal, is entirely adequate. See *Conley* v. *Board of Education,* 143 Conn. 488, 495, 123 A.2d 747, and cases cited. Thus, the requirements of due process are met. *Graham* v. *Houlihan,* 147 Conn. 321, 330, 160 A.2d 745, cert. denied, 364 U.S. 833, 81 S. Ct. 70, 5 L. Ed. 2d 57; *Proctor* v. *Sachner,* 143 Conn. 9, 16, 118 A.2d 621.

Finally, the defendant asserts that, in § 17-90, the legislature has unconstitutionally delegated power to the welfare commissioner without providing adequate standards to guide the commissioner's exercise of discretion. This claim raises the question whether the statute declares a legislative policy, establishes primary standards for carrying it out, or lays down an intelligible principle to which the commissioner must conform, with a proper regard for the protection of the public interests and with such degree of certainty as the nature of the case permits, and enjoins a procedure under which, by appeal or otherwise, both public interests and private rights shall have due consideration. *State* v. *Stoddard,* 126 Conn. 623, 628, 13 A.2d 586. Inasmuch as a statement of legislative policy does not appear in the statute, that element of the test must be gathered from the chapter relating to A.D.C.; General Statutes c. 302, part 2; of which § 17-90 is a part. *Roan* v. *Connecticut*

*Industrial Building Commission,* 150 Conn. 333, 339, 189 A.2d 399. The policy and purpose thus indicated clearly is to provide a means for the support of dependent children in the home of the supervising relative applying for aid as preferable to placement in a state institution. To accomplish this purpose, a relative having a dependent child or dependent children "who is unable to furnish suitable support" and who cannot "furnish support on a reasonable standard of health and decency" (§ 17-85) may apply for support "to an extent adequate to enable the relative caring for such child or children, together with all other available income and support, to maintain a standard of living in the home reasonably compatible with health and decency for such child or children." § 17-87 (a). On an aplication for such aid, the commissioner is required to "investigate the financial condition of each applicant's and recipient's husband, wife, father, mother and child or children" and thereafter to grant aid, if he finds the applicant eligible, in such amount "as is needed in order to enable the relative to support such dependent child or children and himself in health and decency" and further to "make a determination as to the financial ability of each relative referred to [in the statute] to contribute to the applicant's or recipient's support in accordance with a reasonable contribution scale established by said commissioner." § 17-90. The standards thus enumerated for carrying out the legislative policy are as clearly defined as the subject matter permits and, while necessarily broad, do not authorize arbitrary action on the commissioner's part. Protection against any possibility of arbitrariness is afforded by the provision for an appeal to the courts. Statutes in even broader terms have suc-

cessfully met the *Stoddard* test. See cases such as *West* v. *Egan,* 142 Conn. 437, 443, 115 A.2d 322; *Len-Lew Realty Co.* v. *Falsey,* 141 Conn. 524, 529, 107 A.2d 403; *State* v. *Vachon,* 140 Conn. 478, 482, 101 A.2d 509; *Devaney* v. *Board of Zoning Appeals,* 132 Conn. 537, 540, 45 A.2d 828.

The trial court was correct in concluding that the defendant's attack on the constitutionality of § 17-90 is without merit. The facts involved do not support the defendant's claim that the state is, in effect, underwriting immoral activity and unlawfully requiring the defendant to subsidize such activity under the guise of welfare.

There is no error.

In this opinion the other judges concurred.